**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:23-cr-321 (JEB)** |
| **v.** | : | |
| | : | |
| **JAMES RAY EPPS, SR.,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant James Ray Epps, Sr. to six months' incarceration, which is the high end of the applicable Sentencing Guidelines range of zero to six months. The government also requests that this Court impose, consistent with the plea agreement in this case, $500 in restitution, as well as one year of supervised release.

## I. Introduction

Defendant James Ray Epps, Sr. ("Epps")—a 62 year-old former Marine, roofer, handyman, farmer, and venue operator, now retired—participated in the January 6, 2021 attack on the United States Capitol, a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

Epps pleaded guilty via plea agreement, pre-indictment, to Disorderly or Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2). *See* ECF Nos. 4-5. The government's recommended sentence is supported by Epps' (1) efforts, both on the evening of January 5 and the day of January 6, to inspire and gather a crowd to storm the Capitol to protest the certification of the election; (2) presence among the vanguard of rioters that overwhelmed police at three key breach points, which opened the floodgates to a mob that became thousands strong; (3) presence and general assistance with pushing a large metal-framed sign into a group of police officers holding a defensive line; and (4) participation in a rugby scrum-like group effort to push past the same line of police officers. The Court must also consider that Epps' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings.

This is a unique case in the context of January 6 defendants. Although Epps engaged in felonious conduct during the riot on January 6, his case includes a variety of distinctive and compelling mitigating factors, which led the government to exercise its prosecutorial discretion and offer Epps a pre-indictment misdemeanor plea resolution. Specifically, Epps: (1) turned himself in to the FBI two days after the riot, on January 8, 2021, immediately after becoming aware the FBI was seeking to identify him; (2) cooperated with both the FBI and Congress, participating in multiple lengthy voluntary interviews; and (3) engaged in at least five efforts on January 6 to

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

deescalate conflict and avoid violence between rioters and police officers.[2] He has also expressed what appears to be sincere remorse, *see* PSR ¶ 41, although he continues to speciously blame members of Antifa secretly posing as Trump supporters for the violence and property damage that occurred at the Capitol on January 6. Finally, Epps has been the target of a false and widespread conspiracy theory that he was an undercover government agent on January 6

Here, after accounting for the aggravating and mitigating factors described above, the facts and circumstances of Epps' crime support a sentence of six months of incarceration in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol contained in the Statement of Offense accompanying the plea agreement in this case. *See* ECF No. 5.

### *Defendant Epps' Role in the January 6, 2021 Attack on the Capitol*

In the evening on January 5, 2021, Epps stood amidst a crowd in Black Lives Matter Plaza. In response to people around him proclaiming their anger at, and desire to fight, Antifa and Black Lives Matter-affiliated groups and/or persons, Epps interjected. He said, "Tonight, you can bring shame on us. That's not what it's about." Another person challenged Epps, citing the fact that the American Revolution was sparked by something as minor as taxes on tea. Epps responded:

> We're far beyond that. In fact, tomorrow—I don't even like to say it because I'll be arrested—we need to go IN to the Capitol. We're here to defend the Constitution. [. . .] I'm going to put this out there. I'm probably going to jail for it. Tomorrow, we need to go IN to the Capitol. IN to the Capitol. Peacefully.

---

[2] Other than his four years of service in the Marines from 1979-1983, *see* PSR ¶¶ 89-96, Epps has never been a government employee or agent.

Epps' speech was recorded, broadcast over social media, *see* Exhibit 1, and posted on Twitter, among other platforms.



*Exhibit 1: Screenshot from video of Epps on January 5, 2021, urging people to enter the Capitol "tomorrow" to contest the certification of the 2020 presidential election. This video of Epps was livestreamed by separately charged defendant Anthime Gionet, 1:22-cr-132.*

The next day, on January 6, 2021, Epps —wearing a beige shirt with desert camouflage patterned long sleeves, a brown backpack, and a red "TRUMP" baseball cap—attended the "Stop the Steal" rally on the Ellipse. There, Epps was recorded telling one group of rally goers, "As soon as the President is done speaking, we go to the Capitol. The Capitol is this way!", *see* Exhibit 2, and similarly telling another "As soon as President Trump is finished speaking, we are going to the Capitol. It's that direction. That's where our true problems lie," *see* Exhibit 3. When former President Trump began speaking, Epps, along with many others, left the rally and walked toward the Capitol via the Pennsylvania Avenue approach.

At approximately 12:52 p.m., while former President Trump was still addressing the crowd, a small group of people, including Epps, gathered in the area near the Peace Monument on First Street, Northwest. There, U.S. Capitol Police ("USCP") officers had established mesh fencing and bicycle rack barricades with large "Area Closed" signs attached, which delineated the outside

4

edge of the restricted area. Shortly after the mob of rioters reached this outermost barrier, which was unguarded by officers, rioters threw the barricades aside and the crowd—including Epps, who was standing nearby at the very front—surged forward, breaching the first line of defense for the Capitol grounds and entering the restricted area. *See* Exhibit 2.



*Exhibit 2: Rioters massed at the unguarded outermost barricade, with Epps circled in yellow. The second barricade, which was guarded by a small group of officers, boxed in yellow, can be seen in the distance.*

After the breach of the outer perimeter, scores of people advanced past the trampled barricades and toward the Capitol. Approximately one hundred feet up the walkway, the crowd approached a second set of barricades, which were guarded by a small group of USCP officers. *See* Exhibit 3.



*Exhibit 3: at the Peace Circle, mesh fencing and bicycle rack barricades, bearing "Area Closed" signs, blocking the path to the U.S. Capitol building.*

Less than one minute after arriving at the second barricade, members of the crowd grew increasingly agitated and confrontational with the small group of police officers. One member of the crowd, wearing a black t-shirt over a white long-sleeved hoodie and a red "Make America Great Again" baseball hat—later identified as separately charged defendant Ryan Samsel*, see United States v. Samsel, et al.*, 1:21-cr-537—turned his baseball hat around backward while yelling at the police officers. Epps—standing right at the very forefront of the mob of rioters—approached Samsel and spoke in his ear.[3] *See* Exhibit 4.

---

[3] Epps, throughout various interviews, has repeatedly stated that he whispered something to the effect of "Dude, relax. The cops are doing their job." Samsel has provided multiple contradictory accounts of what Epps said to him. The government does not include this incident amongst the five instances of Epps attempting to deescalate conflict and avoid violence between rioters and police officers.



*Exhibit 4: photograph of Epps speaking in Samsel's ear just before the second barricade breach.*

Seconds later, at approximately 12:54 p.m., the group of rioters on the front line aggressively shook the barricades and attacked the officers trying to stop them. With Epps standing nearby and looking on, the rioters violently overwhelmed the officers and destroyed the barricades, and surged forward. officers. *See* Exhibit 5.



*Exhibit 5: screenshot from video of the rioters at the Peace Circle surging forward, knocking over the barricades and fencing, as Epps (outlined in yellow) looks on from the front line.*

The flood of rioters, with Epps near the front, then stormed through the downed barricades, further penetrating the restricted area, setting an example for other rioters to follow, and opening a wide path for the mob to do so. *See* Exhibit 6.



*Exhibit 6: screenshot from video of the rioters, including Epps (circled in yellow), storming past the downed barricades.*

A short way down the path, the group of rioters, including Epps, encountered a third set of barriers, including a waist high fixed metal fence. Other rioters toppled those barricades too. They—with Epps again near the front—rushed past the third set of downed barricades and continued to penetrate the restricted Capitol grounds. By approximately 1:00 p.m., less than ten minutes after storming past the outer perimeter, Epps and a large group of other rioters made their way to the West Plaza, a restricted area on the Capitol grounds, just outside of the Capitol building. *See* Exhibit 7.



*Exhibit 7: photograph of Epps (circled in yellow) in the middle of the West Plaza.*

Lines of uniformed USCP and MPD police officers struggled to keep rioters from further advancing on the west side of the Capitol building as rioters continuously assaulted them with fists, pepper spray, and items such as flagpoles. USCP and MPD officers were ultimately able to re-form a line and push the crowd away from the building, as can be seen in Exhibit 8 below.



*Exhibit 8: screenshot from video of West Plaza showing police line (yellow) blocking rioters from further advancing.*

Meanwhile, an unrelated group of rioters wheeled a large "Trump" sign, which measured approximately 8 feet tall by 10 feet wide, to the south end of the West Plaza. While the sign itself was made of fabric, the frame was metal and had four heavy metal casters on it, each as large as a person's head. Once the group arrived with the metal-framed "Trump" sign, the rioters gathered at the West Plaza lifted it overhead and passed it north, as if the sign was being crowd surfed. *See* Exhibit 9.



*Exhibit 9: screenshot from video of rioters on the West Plaza passing the metal "Trump" sign overhead.*

When the sign reached the middle of the West Plaza, where Epps was standing, rioters worked together to turn the sign approximately 90 degrees and began pushing it toward the line of officers standing between the rioters on the West Plaza and the Capitol building itself. During that group push, Epps briefly placed both of his hands near or on the sign's fabric and/or frame for several seconds. *See* Exhibit 10.



*Exhibit 10: screenshot from video of Epps (outlined in yellow) with both hands on the sign.*

Epps appeared to reach for the sign both as it passed overhead and after it cleared his space.

Once the sign was beyond his reach, Epps pointed forward, toward the line of police officers, several times. *See* Exhibit 11.



*Exhibit 11: screenshot from video of Epps' arm and hand (outlined in yellow) repeatedly pointing forward after the sign passed beyond his grasp.*

Seconds later, at approximately 1:40 p.m., other rioters successfully pushed the sign into the group of police officers. The sign's immense size and forcible impact broke and scattered the police line. The officers managed to wrest the sign away from the rioters and move it out of their reach.

While officers were occupied with the sign, a group of rioters, including Epps, pushed forward in its wake, leaning their bodies on each other like a rugby scrum. *See* Exhibit 12.



*Exhibit 12: screenshot from video of Epps (circled in yellow), along with other rioters, pushing forward after the sign impacted the line of officers.*

Police officers responded by deploying chemical spray on the rioters at the front of the scrum. The rioters—including Epps—immediately fell back and dispersed.

Epps remained on restricted Capitol grounds for approximately 30 additional minutes. Video evidence shows that during his time on Capitol grounds—both before and after his participation in the sign push described above—Epps made at least five attempts to deescalate conflicts between other rioters and police officers and prevent rioters on the West Plaza from

attacking police along their defensive line. Specifically, Epps walked back and forth in the few feet of space between the line of police officers and the mob, and on multiple occasions tried to persuade hostile rioters who seemed primed for violence to calm down and back off. For example, Epps walked up to one rioter just as that rioter was yelling at a police officer, "Take that swing. Take a swing at me motherfucker. Take that swing. What are you saying? Speak up! Take off that fucking thing. [. . .] I'd love to fucking get it on. I would've come locked and loaded if I'd known this was happening." Epps put his hands out and told the rioter:

> Take a step back. Take a step back. We're holding ground. We're not trying to get people hurt. They don't want to get hurt, you don't want to get hurt. Just back up. It doesn't matter. We've made our point. We don't want to take away from what we did.

Epps then continued down the line and said similar things to others. When Epps returned to where that same rioter was standing and still spewing aggressive invective, Epps told the rioter "Alright. Alright. They have a job. They have a job."

At 2:12 p.m., while still on the West Plaza, Epps replied to an earlier text message from his nephew telling Epps to "be safe" by writing "I was in the front with a few others. I also orchestrated it." Epps left Capitol grounds soon after. He did not enter the U.S. Capitol building.

Shortly after leaving the Capitol grounds, Epps gave an interview to an unknown individual, which was recorded. The interviewer summarized Epps' position as follows:

> So you're saying you are marching down there and it's one more thing that we as patriots can do to show those elected officials, look we didn't just come out here to jump around and yell and scream. We came here to be visible and we came here to make a point and that's right where you are, right? That's exactly what you're saying. You want these guys to know.

Epps then agreed with the interviewer's summary.

*Epps' FBI Interviews*

On January 6, 2021, the FBI posted online a number of photographs of "persons of interest"—individuals involved in the "Violence at the United States Capitol" earlier that day – advertising that the FBI was "seeking information" about these individuals. Photograph #16 depicted Epps speaking to Samsel just before Samsel and the crowd breached the manned barricade near the Peace Circle. *See* Exhibit 13; *see also* Exhibit 4 *supra.*



*Exhibit 13: FBI request for information, posted online, depicting Epps in Photograph #16.*

Two days later, on January 8, 2021, Epps called the FBI tip line and identified himself as the person depicted in Photograph #16. In that same call, Epps gave a lengthy consensual interview concerning his activities on Capitol grounds on January 6. Among other statements, Epps admitted that he had attended the "Stop the Steal" rally and told people to go to the Capitol afterward. Epps also admitted to observing other rioters tear down barricades and confront police.

On March 3, 2021, Epps—with counsel present—participated in a consensual follow-up interview with FBI agents. During that interview, Epps identified himself in photographs and videos from the January 6 riot at the Capitol. He stated that when word started to spread that rally goers were going to the Capitol after the speeches concluded, he decided to help spread the message and that he wanted to be in the front of the pack. Epps further understood that he was trespassing on January 6, 2021, and while he intended to enter the Capitol, he did not intend to break in. His goal was to walk "into the front door and let them [lawmakers] know what they [Trump supporters] think."

*Defendant's Interview with the January 6 Committee*

Beginning with an article published on October 25, 2021, by the online publication *Revolver News*, Epps became the centerpiece of an ongoing conspiracy theory that the January 6 riot was intentionally orchestrated and incited by undercover federal agents seeking to discredit and entrap Trump supporters.[4] According to the conspiracy theory, Epps was one such undercover federal agent. Consequently, Epps became a polarizing figure who has received significant and dangerous attention.

Epps—who has never been a government employee or agent, other than his four years of service in the Marines from 1979-1983—was interviewed by the House of Representatives Select Committee to Investigate the January 6th Attack on the U.S. Capitol, commonly known as the

---

[4] "Meet Ray Epps: The Fed-Protected Provocateur Who Appears to Have Led the Very First 1/6 Attack on the US Capitol," *Revolver News*, Oct. 25, 2021, *available at*: https://revolver.news/2021/10/meet-ray-epps-the-fed-protected-provocateur-who-appears-to-have-led-the-very-first-1-6-attack-on-the-u-s-capitol/ (last accessed Dec. 11, 2023).

"January 6th Committee." Epps cooperated with Congress. The transcript of his lengthy interview is publicly available.[5]

During the interview, Epps admitted that his goal was to "get as many people in [the Capitol Rotunda] as we can and surround it, be there, let them know that we're not happy with the—with what—what has happened." Epps Committee Tr. at 27:15-19. When the interviewers asked Epps about the text he sent to his nephew in which Epps bragged that he "orchestrated it," Epps stated that he meant that he "helped people get there" and that he "took credit" because he was "pretty proud that we were all there" but that at the time he "didn't see the whole picture" and was unaware of the extent of the violence and damage that ensued – a rather specious claim in light of his conduct, vantage points, and observations that day. *Id.* at 63:17-64:4. Epps described the riot as "terrible," "sad," and "an embarrassment" that "took away from everything. Who's going to listen to anybody when something like that is going on?" *Id.* at 64:10-12. Ironically, given the conspiracy theory surrounding him, Epps repeatedly attributed the violence that occurred on January 6 to undercover members of Antifa posing as Trump supporters and inciting others to hijack a righteous peaceful protest. *See, e.g.*, *id.* at 32:19-33:3, 45:10-11, 50:16-23, 62:11-15, 67:15-68:19, 68:23-69:3.

*The Charges and Plea Agreement*

On September 18, 2023, the United States charged Epps by a one-count Information with violating 18 U.S.C. § 1752(a)(2). On that same day, pursuant to a plea agreement Epps pleaded guilty to that Information. By plea agreement, Epps agreed to pay $500 in restitution to the Architect of the Capitol.

---

[5] *See* "CTRL 0000038864 - Transcribed Interview of Ray Epps (January 21, 2022)" ("Epps Committee Tr."), available at: https://www.govinfo.gov/app/details/GPO-J6-TRANSCRIPT-CTRL0000038864/context (last accessed December 28, 2023).

### III.     Statutory Penalties

Epps now faces sentencing for violating 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, Epps faces up to twelve months of imprisonment and a fine of up to $5,000. Epps must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.     The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. The U.S. Probation Office calculated Epps' criminal history as a category I. PSR at ¶ 58. Accordingly, the U.S. Probation Office calculated Epps' total adjusted offense level, after acceptance, at 8, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 53, 123. Epps' plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. The government agrees

with Probation that Section 4C1.1 does not apply in this case because Epps engaged in two instances of violence against police officers guarding the Capitol building. Specifically, Epps contributed to the rioters' push of a metal-framed sign (and dangerous weapon) into a group of police officers and added the mass of his body to the subsequent rugby scrum that surged forward and pushed against the same group of officers. The government is aware of at least three cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence, *United States v. Gundersen*, 21-cr-137 (RC), *United States v. Baquero*, 21-cr-702 (JEB), and *United States v. Dillard*, 23-cr-49 (JMC).

The Court also should not apply § 4C1.1 here because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 607 F. Supp. 3d 1, 9 (D.D.C. 2022) (Judge Kollar-Kotelly) ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioter contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"), *aff'd,* 2023 WL 8594077 (D.C. Cir. Dec. 12, 2023) (per curiam).

Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for

offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, even if the Court finds that § 4C1.1 applies the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[6]

---

[6] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. For the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. As described below, the Section 3553(a) factors weigh in favor of six months of incarceration, the high end of the applicable guidelines range.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Epps' participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors for Epps.

The most important factors in Epps' case are: his role in encouraging the mob to storm the Capitol; his presence at the front of the mob as it breached the first three barricades, overwhelming the police with sheer numbers and mass; his contribution to the movement of the metal-framed "Trump" sign thrusted into the line of police officers; and his participation in the group push against the police line that followed. Even if Epps did not physically touch law enforcement officers or go inside of the building, he undoubtedly engaged in collective aggressive conduct.

The mob's sheer size on January 6 is what made it so powerful. The police were massively outnumbered and thus overwhelmed. Epps was not just one person among many, however. Beginning the night before the riot and continuing during the rally on January 6, Epps worked to build the size of that mob. As a tall, loud, and repetitive messenger, Epps was one of the primary cheerleaders in the crowd advocating for breaching the restricted perimeter and entering the

Capitol building *en masse*. He was then at the very forefront of the group of rioters that breached the first barricades. While Epps did not tear down any fencing himself, he immediately and eagerly ran right behind those that did. His presence and large physical stature—he stands 6'4" and weighs 205 pounds, *see* PSR ¶ 80—contributed to the power, mass, and weight of the mob, and these factors likely emboldened others as they considered taking action. With people like Epps setting the example and leading the way, thousands followed and stormed the Capitol. In this way, and by his own admissions, Epps assisted in turning a trickle of people that the police could have contained into a flood that they could not.

Once on the West Plaza, Epps participated in two connected violent incidents. First, Epps contributed to the mob's use of the large metal-framed "Trump" sign as a battering ram against the line of police officers. A preponderance of the evidence suggests that Epps was aware of the threat to police and contributed to it. He even attempted to reach for the sign after it had cleared his head and body space. Once it was beyond his grasp, he pointed forward, towards the police line. Even if the Court determined that Epps' intent was not to harm police, that was nonetheless the effect of his actions.

One USCP officer, who was part of that police line, described the sign's frame as so heavy that it took at least 15 officers to carry the sign away after the rioters thrust it into them. The government is unaware of any officers having been injured by the sign, but one officer said that due to the sign's size and weight, and the sharp edges of its metal frame, it could have "split someone's head open." Other courts have found that the use of the sign as a battering ram constituted an assault with a dangerous weapon against the police officers. *See, e.g.*, *United States v. Thomas Hamner*, 21-cr-689 (ABJ).

After the sign crashed into—and broke—the police line, the mob of rioters in front of the breach point, which included Epps, surged forward, seeking to take advantage. The rioters collectively pushed, leaning their bodies on each other. Again, the mob's power and danger derived from its mass, the sheer number of rioters working together to use their bodies and collective strength to overwhelm the police, and Epps' large size was an asset.

Thousands of rioters stormed the U.S. Capitol on January 6. The night before and on the day itself, Epps worked to build the size of that mob. He left the rally to march on the Capitol before former President Trump finished speaking. He ran to be at the front of the first group of agitators. When those agitators broke down each of the sets of barricades on the Pennsylvania Avenue approach, Epps ran right behind them. Epps and the other rioters cleared a path that inspired others to engage in dangerous and lawless behavior as well. And then, once on the West Plaza, he was an instrumental presence. Accordingly, the nature and the circumstances of this offense establish the clear need for a serious sentence of six months of incarceration in this matter.

**B. Epps' History and Characteristics**

As set forth in the PSR, Epps served four years in the U.S. Marine Corps and was honorably discharged in 1983. PSR ¶¶ 89-96. Epps' military training included training in riot and crowd control. *Id.* ¶ 94. While Epps' military service is laudable, it renders his conduct on January 6 all the more troubling. As a former military member, particularly one with specialized training concerning riots, Epps knew better than most the danger that police officers faced on January 6, yet he contributed to it.

Epps' case is unlike any other for three reasons: (1) his repeated attempts to deescalate conflicts between rioters and police officers; (2) his immediate and fulsome cooperation with law enforcement just two days after the riot; and (3) the widespread impact by the conspiracy theory

that he was acting as a federal agent on January 6, a theory that continues to affect him, but also attempts to undermine the integrity of the ongoing and overall federal prosecution.

Other than his four years in the Marines, Epps has never been a federal agent. He was not a federal agent or working at the direction of a federal agent on January; Epps only acted in furtherance of his own misguided belief in the "lie" that the 2020 presidential election had been "stolen." PSR ¶ 41. However, due to the outrage directed at Epps as a result of that false conspiracy theory, he has been forced to sell his business, move to a different state, and live reclusively. Nevertheless the mitigation value of these harms must still be contextualized. Many January 6 defendants have suffered adverse ancillary consequences in their lives due to their participation in the riot. Many have lost their jobs and/or suffered social ostracization. Sentencing courts in this district have generally rejected arguments that such defendants have already been punished enough by society for their actions on January 6.

The Court should also note that Epps identified himself to the FBI just two days after the riot, as soon as he discovered the FBI was seeking information about him. *See* Exhibit 13. He then provided reliable information during several key interviews.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 (Judge Berman-Jackson: "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 (statement of Judge Nichols at sentencing).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a term of incarceration. While Epps turned himself in to the FBI, voluntarily spoke at length with the FBI and Congress about his conduct and motivations, and expressed what appears to be sincere remorse for his actions on January 6 and those of others, as well as for the damage to democracy, *see* PSR ¶ 41, a just punishment nevertheless has meaningful deterrent value to a person of Epps' convictions. Among other things, Epps appears to continue to believe that concerns—by him and others—about the legitimacy of the 2020 presidential election justified

the storming of the Capitol, just not the violence or property damage. *See* Epps Committee Tr. at 64:7-12.

Moreover, Epps explained his own presence at the forefront of the rioters who broke through the initial barricades with the unapologetic statement, "Marines are always in the front, not in the back." *Id.* at 46:18. Despite his own time in service to the nation, Epps fails to recognize that this aphorism refers to Marines acting as the tip of the spear *for* the government, not *against* it. Nothing in Epps' public statements—to *60 Minutes*[7] and *The New York Times*,[8] for example— or in his interviews with the FBI, the January 6 Committee, or Probation assures the government that Epps would not take additional action if he thought that it was justified or that his presence at the front would be helpful. The Court must sentence Epps in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on police officers, to conspiracy to corruptly interfere with Congress.[9] This Court must sentence Epps based on his own conduct and relevant characteristics. No previously sentenced case contains

---

[7] "Ray Epps: The 60 Minutes Interview," Apr. 23, 2023, available at: https://www.cbsnews.com/video/ray-epps-jan-6-capitol-protest-60-minutes-video-2023-04-23/ (last accessed Dec. 11, 2023).

[8] "A Trump Backer's Downfall as the Target of a Jan. 6 Conspiracy Theory," *The New York Times*, Jul. 13, 2022, available at: https://www.nytimes.com/2022/07/13/us/politics/jan-6-conspiracy-theory-ray-epps.html (last accessed Dec. 11, 2023).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

the same balance of aggravating and mitigating factors present here. As described above, Epps'

case is unique.

Epps has pleaded guilty to Count 1 of the Information, charging him with Disorderly or

Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2).

This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18

U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do

apply, however.

While Epps' case is unique, other judges of this court nevertheless have sentenced Capitol

breach defendants who encouraged others to storm the Capitol and did so themselves, and at least

one of those cases provides an informative comparison to the relevant sentencing considerations

in this case.

In *United States v. Brandon Straka*, 21-cr-579 (DLF), the defendant—a social media

influencer with a large following—used his platform to help incite, promote, and encourage the

riot. After learning that the Capitol had been breached, Straka went to join the mob and

livestreamed his participation in the riot. While Straka did not enter the U.S. Capitol building

himself, he encouraged others to do so, chanted, and urged rioters to "hold the line" against the

police while yelling "take it, take it" as rioters stripped a police officer of his riot shield. Straka

pleaded guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the

Capitol building or grounds) and Judge Friedrich sentenced him to 3 months of home detention as

a condition of 36 months of probation. Epps' conduct was worse than Straka's, and thus, Epps

deserves a harsher sentence. While both Straka and Epps helped build the mob, Epps did so over

a longer time span and while acknowledging the illegal nature of the pending gathering. Straka did

not participate in any acts of violence against officers; Epps contributed to two. Also unlike Straka, Epps was constantly at the front of the mob in the first three breaches, directly witnessed hand-to-hand violence against police officers, and still charged forward, taking advantage of the openings that violence created.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.   Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[10] Generally, restitution under the VWPA must "be tied to the loss

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Epps must pay $500 in restitution, which reflects in part the role Epps played in the riot on January 6.[11] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Epps' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 144.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the §3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to six months' incarceration, one year of supervised release, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on

---

against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Epps' liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime, his efforts to deescalate conflicts between rioters and police officers, and his cooperation with the FBI and Congress.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

*/s/ Michael M. Gordon*
MICHAEL M. GORDON
Senior Trial Counsel
Capitol Siege Section
Assistant United States Attorney
Florida Bar. No. 1026025
400 N. Tampa Street, Suite 3200
Tampa, Florida 33602-4798
michael.gordon3@usdoj.gov
(813) 274-6000